# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KELLY FOSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | **AND RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | 1:07CV701 |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Kelly Foss, brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Social Security Act (the "Act"). The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

## Procedural History

Plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on April 30, 2004 (protective filing date, April 14, 2004), alleging a disability onset date of April 30, 2002. Tr. 46, 221; 49. The applications were denied initially and upon reconsideration. Tr. 28, 31; 225, 226. Plaintiff requested a hearing de novo before an Administrative Law Judge

(ALJ).  Tr. 43.  Present at the hearing, held on December 11, 2006, were Plaintiff, her attorney, and a vocational expert (VE).  Tr. 235.

By decision dated January 22, 2007, the ALJ determined that Plaintiff was not disabled within the meaning of the Act.  Tr. 13.  On July 20, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, Tr. 5, thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 30, 2007.
>
> 2.  The claimant has not engaged in substantial gainful activity since April 30, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).  . . .
>
> 3.  The claimant has the following severe combination of impairments: bipolar disorder, psychotic disorder, alcohol dependence and organic mental disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

Tr. 15-16.  He continued:

> 5.  After careful consideration of the entire record, the undersigned finds the claimant to have no physical problems that would limit her residual functional capacity and she would have the ability to sit or stand or walk 6 hours of an 8 hour workday, with normal breaks.  She could lift and/or carry 50 pounds occasionally and 25 pounds

frequently. She could perform frequent climbing of stairs and ramps, balancing, kneeling and crawling, stooping and crouching. She would have no communicative, manipulative, or environmental restrictions. Her mental restrictions limit her to performing simple, repetitive, routine tasks in a low stress, non-production environment. She would be limited to occasional contact with co-workers and no dealing with the public.

Tr. 17. The ALJ determined that Plaintiff was unable to perform her past relevant work. Tr. 20.

Plaintiff, born on July 14, 1958, was 43 years old at her alleged onset date, regulatorily defined as a younger individual. See Tr. 21 (citing 20 C.F.R. §§ 404.1563 and 416.963). The ALJ found that Plaintiff has at least a high school education and can communicate in English. He added that transferability of job skills was not an issue in the case. Based on these factors, Plaintiff's residual functional capacity (RFC), and the VE's testimony, the ALJ concluded that "the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Tr. 22. Accordingly, the ALJ decided that Plaintiff was not under a "disability," as defined in the Act, from April 30, 2002, through the date of his decision. Id.

## Analysis

In her brief before the court, Plaintiff argues that the Commissioner's findings are in error because the ALJ erred in his assessment of her treating physician's opinion and, as a result, in his formulation of her RFC and the hypothetical to the VE. Plaintiff also alleges that the ALJ committed error at step three of the sequential

evaluation process. The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

Scope of Review

The Act provides that, for "eligible"[1] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).[2]

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration, by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must determine whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Act's listing of impairments ("the Listings"), (4) has an impairment which prevents past

---

[1] Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for SSI at 42 U.S.C. § 1382(a).

[2] The regulations applying these sections are contained in different parts of the Code of Federal Regulations (C.F.R.), Title 20, "Employees' Benefits." Part 404 applies to federal old-age, survivors, and disability insurance, and Part 416 applies to supplemental security income for the aged, blind, and disabled. Since the relevant portions of the two sets of regulations are identical, the citations in this report will be limited to those found in Part 404.

4

relevant work, and (5) has an impairment which prevents him from doing any other work. Section 404.1520.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Issues

1.  Treating Physician's Medical Source Statement

Plaintiff first asserts that she is disabled because her treating psychiatrist, Dr. Austin Hall, opined that she has "*marked* concentrational difficulty and *marked* limitation in ability to get along with co-workers[3] and . . . misses work at least three times a month because of psychological problems."  Pl.'s Br. at 6 (footnote added).  Plaintiff adds, "The VE testified that there would be no jobs for a person who did not have the concentration necessary to perform even simple, routine, repetitive tasks," and Dr. Hall opined that Plaintiff's concentrational limitations were "*marked*."  Id. at 6-7.

The court would prefer that Plaintiff had been more precise in her wording.  In the "Medical Source Statement" ("MSS") offered by Plaintiff from Dr. Hall, the doctor checked "Marked Loss" as to Plaintiff's ability to "[m]aintain attention and concentration for extended periods, i.e. 2 hour segments."  Tr. 218.  In turn, the form defines "Marked loss" as "substantial loss of ability in the named activity; can sustain performance only up to 1/3 of an 8-hour workday."  Tr. 217.  Indeed, the VE testified that a hypothetical claimant "would need to be able to concentrate effectively to understand simple work order[s] and carry out simple work tasks over an eight-hour day."  Tr. 260.  The court is not convinced that this confluence of statements results

---

[3]  Plaintiff did not utilize the criterion of getting along with co-workers in support of her argument, nor did the VE address such a factor in his testimony.

6

in a conclusion that Plaintiff is unable to perform simple, routine, repetitive tasks ("SRRT") in a low-stress, non-production environment, as found by the ALJ.

In her second contention, Plaintiff is likewise imprecise. Plaintiff correctly notes that Dr. Hall opined that she would be absent from work "[a]bout three times a month" because of her impairments or treatment. Tr. 217. But the VE did *not* testify that this factor would cause Plaintiff to be unemployable.

Plaintiff's counsel questioned the VE that, "if we were to assume the [hypothetical] individual would likely be absent from work *more than* three days a month, how would that impact on the jobs you listed?" Tr. 260 (emphasis added). In answer to that question, the VE responded, "[T]hat would reduce her ability to meet the attendance requirements for full-time work, so she would not be hired as a full-time employee if she couldn't – if she was missing *20 percent of the work a month, or average one day a week.*" Tr. 260-61 (emphasis added). To the court's count, "one day a week" would amount to at least four days, which is not the question that Dr. Hall answered. Thus, even if the ALJ had fully adopted Dr. Hall's opinion on these criteria, the VE's testimony does not mandate a finding that Plaintiff is disabled.

2. RFC/Step Five Determination

Plaintiff's second claim actually involves a number of different issues. As her complaints, at their base, involve her treating physician's opinion, the court will start there. Although the regulations require that all medical opinions in a case be

considered, section 404.1527(b), treating physician opinions are accorded special status, <u>see</u> section 404.1527(d)(2). "Courts typically 'accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.'" <u>Hines v. Barnhart</u>, 453 F.3d 559, 563 (4th Cir. 2006) (quoting <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 (4th Cir. 2005) (internal citation omitted)).

The rule, however, does not mandate that the treating source's opinion be given controlling weight. <u>See</u> <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). "It is error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." Social Security Ruling (SSR) 96-2p, 61 Fed. Reg. 34490-01, 34491. <u>See also</u> section 404.1527. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." <u>Craig v. Chater</u>, 76 F.3d 585, 590 (4th Cir. 1996). <u>See also</u> <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001) ("Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence."). Further, although a treating physician may offer an opinion as to a claimant's RFC, the final responsibility for deciding this issue is reserved to the

8

Commissioner, and no special significance will be given to the source of such opinion. Section 404.1527(e)(2),(3).

Plaintiff's treating psychiatrist, Dr. Austin Hall, completed a form MSS for entry into the record. Plaintiff claims that "[t]he evidence"[4]

> showed that [she] has *marked* impairment in concentration; that she often experiences interruptions of concentration[5]; that she has a *marked* limitation in ability to get along with co-workers; and that she would miss work about three times a month because of psychological problems.

Pl.'s Br. at 11 (footnote added). Plaintiff complains that the ALJ failed to include these limitations in his hypothetical to the VE.

Once the claimant reaches step five of the sequential evaluation, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). "The purpose of bringing in a [VE] is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). But the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothetical fails to conform to the facts. See Swaim v. Califano, 599 F.2d 1309, 1312 (4th Cir. 1979).

---

[4]   The court assumes that Plaintiff refers to Dr. Hall's MSS as it could not locate this information elsewhere.

[5]   The court cannot determine the basis for this phrase.

9

It is well established that, for a VE's opinion to be relevant, "'it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.'" Hines, 453 F.3d at 566 (quoting Walker, 889 F.2d at 50). But the hypothetical need only reflect those impairments supported by the record. See Howe v. Astrue, 499 F.3d 835, 842 (8th Cir. 2007); Robbins v. Social Sec. Admin., 466 F.3d 880, 886 (9th Cir. 2006); Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); Shepherd v. Apfel, 184 F.3d 1196, 1203 (10th Cir. 1999).

Plaintiff describes the ALJ's hypothetical claim as "limited to [SRRT]; that she could have occasional contact with co-workers; could have no dealing with the public; would be unable to do a production job; and would need a low stress environment," Pl.'s Br. at 11; this is a fair recitation, see Tr. 259. In response, the VE listed three jobs which such a claimant would be able to perform. Tr. 259-60. Plaintiff then compares this hypothetical to a second posed by the ALJ:

> [A]ssume the individual could perform [SRRT] during – throughout an eight-hour workday. If an individual weren't able to maintain concentration to the level needed to perform even [SRRT], and, and had frequent interruptions during a regular workday so that they couldn't perform [SRRT], would there be occupations they could perform?

Tr. 260. The VE responded, "No. She would need to be able to concentrate effectively to understand simple work order[s] and carry out simple work tasks over an eight-hour day. If she couldn't do that, there'd be no jobs." Id.

10

Plaintiff argues that the first hypothetical, which the ALJ apparently adopted, omitted marked limitations in her ability to concentrate and to work among co-workers, thus rendering the ALJ's step-five decision unsupported by substantial evidence. The ALJ's rejection of the second hypothetical clearly shows that the ALJ failed to adopt Dr. Hall's opinion that Plaintiff had a "marked loss" in her ability to "[m]aintain attention and concentration for extended periods, i.e. 2 hour segments." Tr. 218.

The court first notes that these findings by Dr. Hall are regarding Plaintiff's RFC and thus would never be entitled to controlling weight. See section 404.1527(e)(2); see also Tr. 20. Further, as explained by one of our sister courts in the Fourth Circuit,

> This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. See Hays [v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990)]. . . . Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. See Hays, 907 F.2d at 1456; Taylor v. Weinberger, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, see King v. Califano, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Owens v. Barnhart, 400 F. Supp. 2d 885, 889 -90 (W.D. Va. 2005).

11

In addressing his rejection of Dr. Hall's opinion, the ALJ described the MSS as "conclusory, providing very little explanation of the evidence relied on in forming that opinion." Tr. 19. He explained:

> Despite the litany of symptoms listed in the [MSS], the actual office visit notes repeatedly stated the claimant's psychomotor activity as within normal limits. The treatment notes consistently show the claimant is oriented, non-psychotic and has coherent speech. Her affect was full range and appropriate. Her thoughts were well organized. Her mood was fair and her affect slightly constricted. There were no psychomotor abnormalities. These were the consistent themes throughout the treatment history. There were episodic periods of depression or increase in hallucinations, but this was associated with being off of her medication.[6]

Tr. 20 (footnote added).[7] The court finds that the ALJ's decision to reject Dr. Hall's MSS is supported by substantial evidence.

Plaintiff mistakenly implies that the ALJ suggested that Plaintiff was not severely impaired. Rather, he found that she had a severe combination of impairments – including bipolar disorder – which resulted in moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, with one or two episodes of deterioration or decompensation. Tr. 16.

---

[6] Cf. Decker v. Chater, 86 F.3d 953, 955 (10th Cir. 1996) ("The failure to follow prescribed treatment is a legitimate consideration in evaluating the validity of an alleged impairment."); section 404.1530(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.").

[7] As to Plaintiff's lone objection that the ALJ erred in relying on Plaintiff having "normal psychomotor activity," the court notes that this medical observation is just one of several noted by the ALJ, and it is indeed a *medical* observation, made by Plaintiff's doctor, as to the absence of a symptom. See American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th ed. Text Rev. 2000).

12

Moreover, the ALJ determined that Plaintiff's severe impairments would limit her to the performance of SRRT in a low stress, non-production environment, with only limited contact with co-workers and no contact with the public. Tr. 17.

Plaintiff returns repeatedly to the "rule" that an ALJ must cite "persuasive contradictory evidence" to "overcome a treating physician's opinion."[8] See, e.g., Pl.'s Br. at 10. But the ALJ *did* cite to such evidence, namely, Dr. Hall's own records. The ALJ's rejection of Dr. Hall's opinion, based on the *absence of substantial documentation*, is in accord with both the regulations and law in the Fourth Circuit.

Courts evaluate and weigh medical opinions, in part, based on the supportability of the physician's opinion, and the consistency of the opinion with the record. See Johnson, 434 F.3d at 654 (citing section 404.1527). Further, an ALJ's decision to discount a treating physician's form assessment, such as Dr. Hall's MSS, may be upheld "where the limitations listed on the form 'stand alone,' and were 'never mentioned in [the physician's] numerous records or treatment' nor supported by 'any objective testing or reasoning.'" Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (alterations in

---

[8] "The ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence[.]" Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992), cited in Hines, 453 F.3d at 563 n. 2.

13

Reed)).  Accordingly, the court finds no error in the ALJ's decision not to adopt the limitations from Dr. Hall's MSS.[9]

Plaintiff avers that the ALJ erred in assessing her RFC without input from experts, in that the state agency consultants formed their opinions without the benefit of Dr. Hall's records.[10]  Plaintiff argues that Ruling 96-2p provides that rejection of the treating physician's opinion requires an understanding of the clinical signs and laboratory findings and what they signify, which, she contends, a layperson such as the ALJ does not have.  Yet this does not make sense, as Ruling 96-2p is addressed to adjudicators, such as the ALJ, who are not presumed to have medical expertise.  In fact, the Ruling suggests that the adjudicator *may* consult with a medical expert in the event of a need "to gain *more* insight into what the clinical signs and laboratory findings signify in order to decide whether a medical opinion is well-supported or whether it is not inconsistent with other substantial evidence in the case record."  Id. at 34492 (emphasis added).

_____

[9]    Plaintiff also contests the ALJ's second reason for rejecting the opinion:  "Indeed, it would appear that Dr. Hall's assessment of the claimant's capacity for work-related activities in December 2006 was overshadowed by the claimant's subjective complaints, which are not supported by Dr. Hall's own clinical findings and notes (Exhibit 10F)."  Tr. 19-20.  Unlike Plaintiff, the court is not quite sure what the ALJ means by "overshadowed," but to the extent he may have erred in dismissing Plaintiff's subjective complaints, the court finds his other reasoning sufficient to sustain his decision.  Further, the ALJ did *not* reject Dr. Hall's opinion because of a lack of objective evidence, as suggested by Plaintiff, but rather, because he found that Dr. Hall's findings did not reflect such complaints.

[10]    Although Plaintiff guesses that the ALJ did not rely on these opinions because "they were significantly out-dated," Pl.'s Br. at 10, there is nothing in the ALJ's decision to substantiate this statement.   One can make the argument that the ALJ found these assessments persuasive as he deemed their conclusions "valid."  Tr. 20.

As to Plaintiff's charge that the ALJ impermissibly "played doctor," the Commissioner has determined that it is the ALJ's responsibility "to identify the pertinent evidence from medical and nonmedical reports and to make findings as to the individual's ability to perform work-related activities (RFC)." SSR 85-16, 1983-1991 Soc. Sec. Rep. Serv. 352, 354. <u>See</u> section 404.1546; <u>see also</u> section 404.1520a(d)(3), section 404.1527(e)(2). Plaintiff points to no regulatory requirement that this assessment be performed by a medical expert or other physician, and the court is aware of none.

Indeed, the First Circuit Court of Appeals expresses reservations about an ALJ assessing RFC "based on a bare medical record," but allows "common-sense judgments about functional capacity based on medical findings." <u>Gordils v. Secretary of Health & Human Servs.</u>, 921 F.2d 327, 329 (1st Cir. 1990) (per curiam). Specifically, an expert's RFC evaluation is *not* essential if "the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." <u>Santiago v. Secretary of Health & Human Servs.</u>, 944 F.2d 1, 6-7 (1st Cir. 1991). As explained by <u>Manso-Pizarro v. Secretary of Health & Human Services</u>, 76 F.3d 15 (1st Cir. 1996), whether the ALJ's RFC finding is supported by substantial evidence "depends on a qualitative assessment of the medical evidence that was before the ALJ. If that evidence suggests a relatively mild . . . impairment posing, to the layperson's eye, no significant . . . restrictions, then we must uphold the ALJ's finding; elsewhere, we cannot (in the absence of an expert's opinion)." <u>Id.</u> at 17-18.

15

In Plaintiff's case, however, the court is unsure whether this assessment can be properly performed by a *doctor*, much less a layperson. On several occasions, Dr. Hall indicated that Plaintiff was being less than forthright with him. <u>See, e.g.</u>, Tr. 185, 192, 196, 200. He variously diagnosed Plaintiff's alcohol dependence as in "early remission," "partial remission," "early full remission," "partial early remission," "probable remission," and "remission." Tr. 184-216.

Yet at her December 2006 hearing, Plaintiff testified that she last drank heavily "for about a week, three months ago." Tr. 240. She added that three months before that, she had another "relapse," for a month. Tr. 241. And just prior to that, "[I]t was pretty, pretty heavy. It was, it was – *up until six months*, it was pretty heavy." <u>Id.</u> (emphasis added). Plaintiff stated that the longest period of time, in the previous three years (about December 2003), that she had been able to maintain sobriety was *only three months.*

Although Plaintiff chose April 30, 2002, as her alleged onset of disability, on her Disability Report, she simply stated that she became "unable to work full time" on *June* 30, 2002. Tr. 58. Plaintiff explained that she stopped working at Duke University Medical Center, her last full-time job, "due to inability to multi-task and work in a fast-paced environment." <u>Id.</u> At the time of Plaintiff's discharge from a psychiatric hospitalization, her attending physician wrote, "Apparently, she was terminated due to issues involving alcohol dependence." Tr. 117.

16

The transcript, however, contains no medical records between July 2001 and March 30, 2004, when police brought Plaintiff to the emergency room for "medical clearance and psychiatric eval[uation]." Tr. 102. She had been drinking and falling down and having hallucinations. The hospital subsequently admitted Plaintiff and discharged her after a week with a diagnosis of alcohol dependence, along with a host of disorders most likely stemming from alcohol abuse: delirium tremens, hypokalemia, malnutrition, macrocytic anemia, cerebral volume loss, mild pancreatitis, and alcoholic hepatitis. See Tr. 117. Her doctor opined that Plaintiff did not "have an official cognitive impairment although she is certainly headed down that road." Tr. 119. It was felt that "[i]nsight into her health and cognitive problems is limited."[11] Tr. 121.

Plaintiff's dissembling about her alcohol use is clearly demonstrated during this period. When she first arrived at the emergency room, she confessed to drinking a bottle of wine that day. Tr. 102. Later that night, she told a nurse that she had drunk only "'a couple glasses of wine.'" Tr. 103; see also Tr. 117. Plaintiff's discharging physician remarked that Plaintiff's "true alcohol use history is largely unknown as she has *been very secretive about it* and in denial." Tr. 117 (emphasis added). At her follow-up visit, Plaintiff stated that she only occasionally would drink two glasses of wine, but had not had *anything to drink for three to four days prior to*

---

[11] The social worker believed, however, that Plaintiff would be able "to make her own choices about services and lifestyle." Tr. 121.

17

*her hospitalization.* Tr. 143. Plaintiff told Dr. Hall that, just prior to her hospitalization, "she was drinking about 4 glasses of alcohol each evening." Tr. 211.

In diagnosing Plaintiff with chronic alcoholism, the state agency consultative examiner observed that Plaintiff was still firmly in denial. Tr. 150. The state's psychology consultant stated after Plaintiff's August 2004 interview, that the "validity and reliability" of information garnered was "difficult to ascertain." Tr. 153. In assessing Plaintiff's mental RFC, a state agency psychological expert explained that Plaintiff was limited "*due to alcohol abuse* and associated mental problems." Tr. 182.

Plaintiff's first visit with Dr. Hall was October 15, 2004. See Tr. 211. She told him that she had not drunk since April, but said "that she was drinking about four drinks or so per night consistently through most of that time," Tr. 212; the doctor believed that she might be "under reporting," id. Plaintiff added that she had had "two episodes of alcohol use since April 2004." Id. Dr. Hall mused that Plaintiff's psychological symptoms might be "related to her chronic alcohol use." Tr. 213.

At her next appointment, Plaintiff said that she was not drinking, and her symptoms were better. Tr. 209. Dr. Hall repeated his belief that Plaintiff's alcohol dependence could explain some of her symptoms. Plaintiff was scheduled to return in December, but went from November 23, 2004, to February 8, 2005, without seeing Dr. Hall. Plaintiff reported that, during that period, she returned to heavy

18

drinking, but had since "cut this back significantly" – to only two shots of vodka and two glasses of wine each day.  Tr. 205.

When Plaintiff returned six weeks later, she told Dr. Hall that she had stopped drinking, and was "feeling much better."  Tr. 204.  She was still not drinking when seen on May 4, Tr. 203, but was in bad shape on June 29, when Dr. Hall had her come in after a call from Plaintiff's sister, Tr. 202.  Dr. Hall opined that Plaintiff's condition merited hospitalization.  Although Plaintiff denied drinking, this episode corresponds with the period where she testified that she had a "relapse" for "about a month."  Tr. 205.

Plaintiff continued to affirm that she was not drinking, Tr. 198, 200, but then did not see Dr. Hall from July 14 through October 31, 2005.  On July 14, she was doing well and her mood was good.  Tr. 198.  On October 31, Plaintiff's mood was depressed, and her affect constricted.  Tr. 196.  She denied a return to alcohol use and "any magical thinking or bizarre behaviors," but the doctor remarked that "she has a tendency to minimize these and *to be able to hide these well*."  Id. (emphasis added).   Dr. Hall believed Plaintiff's alcohol dependence to be in "probable remission," id., but September 2005 corresponds to a period  where Plaintiff testified she drank heavily "for about a week," Tr. 240.

During Plaintiff's January 2006 visit, she again denied bizarre behaviors or thinking, but Dr. Hall wrote:  "[T]he patient has minimized such thinking and behaviors in the past and her high intellect allows her to minimize them successfully

19

when she chooses to." Tr. 192. In September 2006, Dr. Hall suspected that Plaintiff's decreasing weight might indicate a return to alcohol use, yet still deemed her to be in "early full remission."[12] Tr. 184.

Dr. Hall's records indicate that there are times that Plaintiff feels well and her symptoms are minimal. See, e.g., Tr. 186 (mood okay, both jobs going well); 191 (doing well, work going well); 192 (mood good; has picked up second job). There are times, however, when Plaintiff is obviously impaired, and the record indicates that these periods correspond with her alcohol abuse. Where substance abuse is a contributing factor material to the determination of disability, and the claimant would not be disabled but for the drug addiction or alcoholism, then the claimant is not entitled to disability benefits. 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J).

Because Plaintiff's ability to prevaricate is so firmly established, the court believes that the ALJ must consult with a medical expert who can review the file in its entirety, which now includes both Dr. Hall's records and Plaintiff's testimony, items not available to the state agency consultants. Further, it would seem advisable for the ALJ to obtain the records of Plaintiff's June 2005 treatment at "Durham Access" and John Umstead Hospital, see Tr. 200, and her records from psychotherapist Dr. Chris Clougherty, see, e.g., Tr. 206, 211, for the relevant period.

---

[12] Plaintiff claims that the ALJ failed to make a "credibility finding as to any of [her] statements," Pl.'s Br. at 8, but he did find her "not entirely credible," Tr. 20. Although the ALJ failed to elaborate, the foregoing summary clearly demonstrates why, and Plaintiff wisely does not challenge the credibility finding.

20

Then, in performing his RFC assessment, the ALJ must "build an 'accurate and logical bridge from the evidence to [his] conclusion' so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002) (quoting Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002)). See also Green v. Apfel, 204 F.3d 780, 781 (7th Cir. 2000) (an ALJ's independent review of the medical evidence must bridge the evidence he is reviewing to his conclusions).

3.  VE Testimony

Plaintiff asserts that the VE's testimony cannot provide substantial evidence to support the ALJ's step five determination because the ALJ's hypothetical failed to include the findings by Dr. Hall that Plaintiff had a marked loss in her abilities to maintain attention and concentration for extended periods, and to get along with coworkers without unduly distracting them or exhibiting behavioral extremes. Because the ALJ failed to adopt Dr. Hall's findings, and the court has affirmed this decision, the ALJ was not required to include these limitations in his hypothetical. A hypothetical need only include impairments that are supported by the record and that the ALJ accepts as valid. Howe v. Astrue, 499 F.3d 835, 842 (8th Cir. 2007); see also Robbins v. Social Sec. Admin., 466 F.3d 880, 886 (9th Cir. 2006); Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); Shepherd v. Apfel, 184 F.3d 1196, 1203 (10th Cir. 1999). If, however, the ALJ's RFC finding changes after review by the medical expert, the ALJ may have to consult again with a VE to

determine if there is a significant number of jobs in the national economy that Plaintiff can perform.[13]

4. Step Three Determination

Plaintiff takes issue with the ALJ's decision not to contemplate whether she meets Section C of Listing 12.03, "Schizophrenic, Paranoid and other Psychotic Disorders." The Listings, found at 20 C.F.R. part 404, subpart P, Appendix 1 (part A) (hereinafter cited to as "The Listings"), is designed to streamline the benefit determination analysis by identifying those "impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" Sullivan v. Zebley, 493 U.S. 521, 532 (1990) (citing § 416.925(a) (1989)). It is described as

> a catalog of various disabilities, which are defined by "specific medical signs, symptoms, or laboratory test results." [Zebley, 493 U.S. at 530.] In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing. Id., 20 C.F.R. § 404.1526(a).

Bennett v. Sullivan, 917 F.2d 157, 160 (4th Cir. 1990). If the claimant proves that he meets a listing, the ALJ need not move on to the next step in the sequential

---

[13] Plaintiff argues that there is "substantial authority" that "merely telling a VE that the claimant can do only simple, routine work is not sufficiently precise to convey all of the claimant's mental impairments." Pl.'s Br. at 14 (emphasis deleted). There is substantial authority to the contrary. See, e.g., Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173-74 (9th Cir. 2008); Smith v. Halter, 307 F.3d 377, 378-80 (6th Cir. 2001); Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001). Each of the cases cited by Plaintiff can be distinguished from Plaintiff's. The court's review of the case law persuades the court that there is no bright-line rule, and that each case must be judged on its own facts.

evaluation process.  See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

The ALJ, however, need not consider a Listing whose criteria are not supported by the record.  As explained by our sister court:

> [I]t is clear that the "duty of identification of relevant listed impairments and comparison of symptoms to Listing criteria is only triggered if there is ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments." Ketcher v. Apfel, 68 F. Supp. 2d 629, 645 (D. Md. 1999).  As noted in Ketcher, the Fourth Circuit has adopted this approach in a series of unpublished opinions[.]

Huntington v. Apfel, 101 F. Supp. 2d 384, 391 (D. Md. 2000).  See also The Listings, 12.00A ("Impairments should be analyzed or reviewed under the mental category(ies) *indicated by the medical findings*." (emphasis added)).

To establish that she meets Listing 12.03(C), Plaintiff must show:

> Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

The Listings, 12.03(C).

Plaintiff claims that she meets all three requirements, but the court disagrees. Plaintiff's medical records contain only one episode of decompensation of extended duration. And there is no indication in Plaintiff's records of marginal adjustment; after Plaintiff took on a second part-time job, she repeatedly assured Dr. Hall that the two jobs were going well. Tr. 186, 191; <u>see also</u> Tr. 188.

As to the third criterion, Plaintiff asserts that she "has *not* been in a highly supportive living arrangement, and she hardly functions." Pl.'s Br. at 17 n. 4. Yet not even Dr. Hall's MSS supports this contention. He opined that Plaintiff suffered "No/Mild Loss" as to her ability to:

- ask simple questions or request assistance;

- maintain socially appropriate behavior;

- adhere to basic standards of neatness and cleanliness;

- be aware of normal hazards and take appropriate precautions;

- travel in unfamiliar places;

- use public transportation.

Tr. 219. Further, he assessed her degree of limitation in "Restriction of activities of daily living" as only "Slight." <u>Id.</u>

24

These assessments are supported by Plaintiff's statements to the state agency consultative examiners. She said that she could do laundry, drive, clean house, and grocery shop. Tr. 149. Plaintiff recounted her daily routine as: drive her roommate to work, check her email, shower, and check her schedule for pet-sitting assignments. She reported that she independently manages her money, and can dress, feed, and bathe herself. Tr. 154. And Plaintiff successfully juggled two part-time jobs.

More important, perhaps, is Plaintiff's failure to show that her alleged inability to function is due to her psychosis, rather than her alcohol dependence. As indicated by her testimony, Plaintiff's symptoms escalate when she engages in heavy drinking, and she is ineligible for benefits if alcoholism contributes to her disability. When Plaintiff was hospitalized in June 2004, she was diagnosed with alcohol hallucinosis. Tr. 107. At follow-up, the physician affirmed that Plaintiff was treated for delirium tremens. Tr. 144. And Dr. Hall acknowledged that Plaintiff's symptoms might be related to her chronic alcohol use. Tr. 213. Overall, because the record fails to indicate that Plaintiff might meet the requirements of Listing 12.03(C), the ALJ committed no error in failing to consider it.

## Conclusion and Recommendation

For the foregoing reasons, the decision of the Commissioner is not supported by substantial evidence, and the correct legal principles were not applied. Therefore, **IT IS RECOMMENDED** that the Commissioner's decision finding no

disability be **REVERSED**, and that the matter be **REMANDED** to the Commissioner under sentence six of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this recommendation. To this extent, Plaintiff's motion for summary judgment (docket no. 11) seeking a reversal of the Commissioner's decision should be **GRANTED**. To the extent that Plaintiff's motion seeks an immediate award of benefits, it should be **DENIED**. Defendant's motion for judgment on the pleadings (docket no. 14) should be **DENIED**.

_____
WALLACE W. DIXON
United States Magistrate Judge

March 10, 2009